Walter B. ENGLAND,
Petitioner-Appellant,

v.

CIVIL SERVICE COMMISSION OF the
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUN-
TY: and Richard H. Fulton, in his offi-
cial capacity as Mayor of the Metropoli-
tan Government of Nashville and David-
son County, Respondents-Appellees.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Feb. 16, 1981.

Certiorari Denied by Supreme Court
June 1, 1981.

Abridged Opinion June 18, 1981.

Joseph Lackey, Jr., Nashville, for petitioner-appellant.

Peter H. Curry, Dept. of Law Metro Government, Nashville, for respondents-appellees.

ABRIDGED OPINION

TODD, Presiding Judge.

(With the concurrence of participating judges, the original opinion has been abridged for publication).

Plaintiff, Walter B. England, filed this certiorari suit to invalidate the action of the defendant, Civil Service Commission, in upholding the action of the defendant Mayor in transferring plaintiff from the position of Director of the Department of Codes Administration to a lesser position of Assistant Director of the Department of Public Works. The Trial Judge affirmed the action of the Commission, and plaintiff appealed.

Appellant's first complaint is that the "Departmental Hearing" did not accord appellant due process under the applicable Civil Service Rules which are as follows:

*Section 10.6 Disciplinary Action*

. . . .

An employee who may be disciplined as provided for in Sections 8, 9, and 10 is entitled to a prompt departmental hearing by his department or division head,

. . . .

The department or division head shall see that notes of the hearing are kept and the official action taken should be noted and the Civil Service Commission and the employee affected notified. Appeal from the decision of the department or division head shall be *heard anew* before the Civil Service Commission.

*Section 10.8 Demotion*

The Department Head may for just cause, and after a proper notice and hearing, demote an employee provided the procedures in Section 6 are followed.

The "Department Hearing" was held by the Mayor on March 17, 1978, at which time the Government offered no evidence; and appellant was advised that the only purpose of the hearing was to afford him an opportunity to answer charges contained in a letter dated March 10, 1978. Appellant's demand that he be confronted with evidence and witnesses was denied, and the hearing was adjourned without presentation of evidence by either side.

Appellant cites *Williams v. Pittard*, Tenn. 1980, 604 S.W.2d 845, wherein a somewhat similar procedure was followed by a county board of education; however, that hearing was the final administrative hearing available to the employee, whereas, in the present case, the "Departmental Hearing" before the Mayor was followed by a further and final hearing by the Civil Service Commission. On this basis, the cited case is distinguishable from the present case.

Appellant cites no other authority to require the reversal of the action of the Civil Service Commission because of a lack of due process in the preliminary "Departmental Hearing." It should be noted that the present case does not involve a discharge, but a transfer with change of duties and minor reduction in pay. Absent a deprivation of rights of employment, a preliminary hearing which omits the usual privilege of facing accusers and seeing or hearing accusatory evidence before being offered the opportunity to respond to, explain or refute charges is not deemed to be a denial of constitutional due process.

The above quoted ordinance provisions for a "departmental hearing" do not specify the form or procedure of such hearing. Therefore, it cannot be said that the Civil Service Commission's ultimate decision was unlawful, arbitrary, capricious or otherwise

invalid because of the alleged infirmities of a prior departmental hearing.

█ Appellant's second complaint relates to the procedure at the hearing before the Civil Service Commission, at which the government offered no witnesses except appellant, himself. Appellant objected to testifying until other government witnesses should be presented; but, when government counsel stated to the Commission that appellant's "appeal" should be dismissed if he refused to testify, appellant acquiesced under protest.

Again, appellant cites *Williams v. Pittard, supra*, wherein the Supreme Court said:

... Mrs. Williams argues through counsel that in effect the Board's procedure shifts the burden upon Williams to go forward and to exculpate herself from the charges prior to hearing any of the evidence in support of them.

..., a teacher with tenure cannot be required to prove his or her innocence or be required to show cause why he or she should be able to continue as a teacher.

In *Williams v. Pittard*, the Board of Education had previously voted to discharge the employee if the charges were found to be true. The hearing was opened by the Chairman with the following statement:

Now, charges have been made. They have been transmitted properly as far as we know—informed. And the purpose of this hearing is first to hear a refutive or rebuttal of the charges made against Mrs. Marie Williams, a kindergarten teacher at Rockvale School. So at this time the Board would like to hear from Mrs. Williams giving her version, her side of the story, and her explanation and refuting of the charges made against her. 604 S.W.2d at 848.

In the present case, no such action or statement preceded the testimony of the employee. The proceedings before the Civil Service Commission opened as follows:

MR. GIBSON: The Civil Service hearing is in order, Mr. Bailey, take over.

MR. BAILEY: The parties have stipulated and agreed that the exhibits be

introduced and numbered prior to the commencement of the hearing and that they be referred to by number as they are needed. Are there any other matters stipulated to? And I believe the parties have been requested to lead their witnesses until they get to matters of dispute. In other words, tell the name of your witness and what he does and all other statistical data that's not in dispute. The lawyer will relate that. Who is the first witness?

MR. CURRY: Our first witness will be Walter England.

After discussion of a motion to remand, opening statements of counsel and a motion to recuse, the following occurred:

MR. LACKEY: Mr. Chairman, before we proceed with Mr. England, I assume from what has transpired here that the Metropolitan Government is calling Mr. England to testify as a witness against himself in this hearing for the purposes of establishing their case. And we would respectfully object to Mr. England having to testify to anything until the Metropolitan Government has put on proof sufficient to carry the burden by the accusers that he is guilty of any of these charges in this complaint. We do not feel that he has any duty to testify prior to them having carried that burden.

MR. BAILEY: Well, I'll overrule the objection. In any litigation, you can always state the deposition of an adverse party.

. . . .

MR. CURRY: Mr. Chairman, you can also call the adverse party as a witness.

MR. BAILEY: You mean, you can call them as a witness. It can be a dangerous thing to do, but you can.

MR. LACKEY: Well, I'm going to advise Mr. England not to answer any questions until the Metropolitan Government has carried the burden of proving these charges in this complaint.

MR. CURRY: Mr. Chairman, I would move that the appeal be dismissed. If the witness refuses to answer, we can't proceed. Let him certify the issue to

Chancery Court and appeal the dismissal. I'm sure the Chancellor will uphold the commissioners' ruling.

MR. BAILEY: Well, I think Mr. England is subject to examination . . . .

Thereupon, the appellant-employee testified as a witness for the Government and was cross-examined by his own counsel. The Government offered no further witnesses. Appellant presented six witnesses, including himself, in his defense.

The distinction between *Williams v. Pittard* and the present case is obvious from the above. In the former case the Board said in effect, "We are presuming you to be guilty until you prove your innocence. If you do not, you will be found guilty." In the present case, the Board said, "We will hear the evidence of the Government first." The Government said, "Our first witness is the accused employee." The employee objected to testifying against himself and the Board said, "You are subject to examination."

It is true that counsel for the Government suggested dismissal of the appeal for refusal to testify, but the Board never ruled on this suggestion.

Accordingly, the issue in the present case is not burden of proof, as in *Williams v. Pittard*, but duty to testify when called by the Government as its witness.

Rule 43.02, T.R.C.P. reads as follows:

*Examination and cross-examination.*—A party may interrogate any unwilling or hostile witness by leading questions. Except as otherwise provided by this rule, the cross-examination of a witness shall not be limited to the subject matter of his examination in chief. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership, association or individual proprietorship which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also and

may be cross-examined by the adverse party but only upon the subject matter of his examination in chief.

In *Cook v. Corn*, 1 Tenn. (1 Overton) 340 (1808) and in *Zollicoffer v. Turney*, 14 Tenn. (6 Yerger) 297 (1834) it was held that the constitutional prohibition against forced self incrimination does not excuse a witness from being required to testify where his answers may subject him to only a civil suit or liability.

In 98 C.J.S. Witnesses § 441 pp. 267–268 authority is cited supporting the following text:

The constitutional guaranty, so far as it affords the right to refuse to be sworn and to testify as to matters other than those which incriminate him, is confined to the person accused or defendant in a proceeding for a criminal matter, and not to civil actions or proceedings. The right or privilege does not extend to a proceeding not involving punishment for the commission of a crime, or the imposition of a fine, or the enforcement of a penalty or forfeiture.

It does not apply to protect against compulsory appearance as a witness of a person against whom deportation proceedings are taken; a defendant in a denaturalization proceeding; a defendant in bastardy proceedings; a contestee in an election contest; a defendant in a suit to escheat land under an alien land law; a lessee in a forcible detainer proceeding; a respondent in proceedings to appoint a guardian for an insane person or incompetent; a defendant in a psychiatric examination by a commission to determine his sanity so as to determine if he should be committed to a mental institution; a relator in a habeas corpus proceeding; a claimant in libel proceedings by the United States to forfeit property intended to be used in violating the revenue laws; a motorist in a hearing to determine whether or not his license to drive should be revoked; or to a juvenile in a special statutory civil proceeding. In such cases the party may be called as a witness,

although he will not be required to give testimony tending to incriminate himself.

In *Wilkerson v. Benson*, Tenn.1976, 542 S.W.2d 811, the Tennessee Supreme Court held that a defendant in a bastardy case could be required to answer interrogatories relating to his sexual conduct and paternity of a child. See also *McCormick* on Evidence, Second Edition, § 121, pp. 257–259.

The present proceeding is not criminal in nature, nor does it involve the imposition of a civil penalty for misconduct which is criminal in nature. It involves a change in responsibility with slight demotion and reduction in pay on grounds of insufficient performance of duties. It is therefore not a proceeding in which the defendant (appellant) is excused from giving evidence against himself by the Constitution, either Federal or State.

■ Appellant makes no claim that he was required to disclose information that would subject him to criminal prosecution, indeed, no effort was made to preserve such a complaint by objecting to specific questions. The only complaint here is that appellant was required to take the stand. Privilege against taking the stand extends only to the accused in a criminal case.

■ Appellant next complains that the Mayor and Civil Service Commission acted without sufficient grounds.

The action of the Civil Service Commission is contained in the verbatim transcript of a meeting of the Board on February 13, 1979, which concludes as follows:

MR. BAILEY: Well, I want to put it in form of a motion. I move that we sustain the action of the Mayor in transferring Mr. England.

CHAIRMAN GIBSON: It has been moved. Do I hear a second?

MR. PILKERTON: I'll second it.

CHAIRMAN GIBSON: It has been moved and seconded. · Any further discussion? All those in favor, let it be known by saying aye.

CHAIRMAN GIBSON: Opposed, no. (pause) So ordered.

The actual demotion which was appealed to the Civil Service Board was in the form of a letter from the Mayor which stated:

Based upon this report and other investigation, the facts before me indicate an inefficient performance of your duties and a failure to perform official duties imposed upon you as Director of the Department of Codes Administration. You have:

1) failed to promulgate effective rules and regulations to determine methods of valuation which accurately reflect the value of buildings to be constructed under the permits issued by your Department.

2) You have been inefficient in your duty to examine permit applications to assure compliance with the Code of Laws of the Metropolitan Government and to deny applications failing to comply with said laws.

3) You have failed to perform your duties as Secretary to the Board of Zoning Appeals in that you have failed to provide the applicants in cases heard before the Board with a transcript of the proceedings in a timely manner.

4) You have not maintained a high standard of cooperation, efficiency and economy in your work for the Metropolitan Government and you have not organized and directed the work of your Department to achieve these objectives.

5) You have failed in your duty to examine applications for permits as required by the Metropolitan Code of Laws.

6) You have failed in your duty to deny those permits in spite of the fact that you should have been aware that the values were underestimated therein.

7) You have failed in your duty to revoke permits issued upon misrepresentations or false statements in spite of the fact that you later became aware of such misrepresentations and false statements.

It would appear that all of these matters could have been corrected by positive

administrative direction on your part. Many of these matters are of a long-standing nature and should have been corrected prior to this time.

For the reasons stated above I charge you with violation of Section 10.2 and 10.6(2) and (3) of the Rules and Regulations of the Civil Service Commission. Section 10.2 provides, in part:

It shall be the duty of each employee to maintain high standards of cooperation, efficiency, and economy in his work for the Metropolitan Government. Department Heads and supervisors shall organize and direct the work of their units to achieve these objectives.

Section 10.6 of the rules and regulations provide for disciplinary action based upon:

2) Failure to perform his official duties.

3) Inefficient performance of his duties or incompetency.

The background of the foregoing charges is as follows:

One of the functions of the codes administration of the Metropolitan Government is to issue building permits for which a fee is charged based upon the estimated cost of construction. Such estimation is usually made by the applicant for the permit based upon the number of square feet in the building and a fixed cost per square foot. Prior to the appointment of appellant to the position of Director of Codes Administration, the cost of construction recognized and accepted by the Codes Administration was $10 per square foot.

Appellant was appointed Director in November, 1974. In the summer of 1976, appellant began discussing with contractors the cost of construction. In December, 1976, appellant notified a contractor's association that the cost of construction was considerably more than $12.

Early in 1977, appellant discussed increasing the building permit fee with an associate Metropolitan attorney who stated to him that a previous mayor had "vetoed" a previous increase by a previous director and that it would be wise to obtain the approval of the Mayor in advance.

On May 6, 1977, appellant wrote the Mayor, quoting Section 11–1–44 of the Metropolitan Code which authorizes the Director to deny a permit based upon an underestimated cost of construction and proposing that "we" establish a cost criterion based upon 1976 average building valuation, which was $25.23 per square foot.

On May 12, 1977, appellant was advised by letter that the matter was under consideration. Sometime thereafter, appellant was informed by a Mayor's assistant that "it was not in the best interest of the Mayor" and that the Council should make the decision. Thereafter the matter was submitted to the Council which "withdrew" the proposed ordinances and requested the Mayor to form a "study committee." Such a committee was formed on November 4, 1977.

On February 7, 1978, the Mayor appointed another committee to investigate underestimation of construction costs in obtaining permits. As a result of the report of the last committee, the above quoted letter was written to appellant by the Mayor.

Appellant concedes that it was his duty to see that adequate fees were collected; that he had the authority to require payment of adequate permit fees at any time after his appointment, but did not do so; and that his efforts to adjust fees were limited to the above-mentioned contacts with contractors and city officials.

Appellant's testimony supports a finding that he knew or should have known that contractors were underestimating costs and paying inadequate fees during the entire period from November, 1974, when he first assumed his duties until early in 1977 when he first proposed an increase in fees by regulation.

Appellant testified that his predecessor increased the cost standard to $9.00 per square foot on February 3, 1969, by office memorandum; that the same predecessor increased the standard to $10.00 per square foot on August 29, 1973; that the 1975 report of the Southern Building Code

showed Tennessee building costs at $17.50 per square foot; that he instituted an informal program of investigation by office personnel which disclosed that some contractors were misrepresenting costs; and that on June 28, 1976, he, appellant, prepared a "proposed" office memorandum which stated:

It is apparent that some building permits are being issued that list the estimated value for the cost of construction far below the average cost of construction for work in this area.

Said "proposed" memo ordered employees to accept no estimate below $17.50 per square foot without a detailed cost breakdown on the executed contract.

Appellant testified that his "proposed" memo was never implemented because the homebuilders told him they were building houses for less than $17.50 per square foot.

The foregoing is sufficient to support appellant's demotion under charges 1, 2, 5, 6 and 7 above, which constitute failure to perform official duties, inefficient performance of duties or incompetency.

■ Under the common law writ of certiorari, the action of a Civil Service Board may be reversed by the courts only when the Board has acted unlawfully, in excess of its authority, arbitrarily, capriciously, or without material evidence to support its decision. *Watts v. Civil Service Board for Columbia*, Tenn.1980, 606 S.W.2d 274, and authorities therein. None of these grounds are shown in the present record.

■ Appellant relies upon Section 2–1–27 of the Metropolitan Code providing his duties as follows:

"(b) To enforce, in the manner provided in this Code, all laws, ordinances, codes and regulations as may be specifically assigned to the department of codes administration for enforcement, and *to promulgate rules and regulations as* may be deemed necessary for the effective enforcement of the same; *provided, that all such rules and regulations promulgated by the director shall become effective upon written approval by the metropoli-*

*tan mayor, and shall be reviewed by the department of law as to form and legality prior to submission of the same to the metropolitan mayor for approval."* (Emphasis added.)

Such reliance is not well founded because appellant's duty to collect proper permit fees was independent of any duty or power to make regulations. He needed no regulation to require every applicant to pay a proper fee. The proposed regulation was a mere proposal to make his work easier. Appellant cannot excuse himself for permitting permits to be issued for inadequate fees by pointing to his efforts to get a regulation approved.

■ Appellant next complains that he is excused because he acted upon the direct order of his superior (the Mayor). Again, appellant's reliance is misplaced. There is no evidence that the Mayor ordered appellant to issue permits for inadequate fees. The communications from the Mayor's assistants related to appellant's effort to promulgate a regulation or obtain a city ordinance to ease his work load or avoid the heavy responsibility of deciding costs of construction on a case-by-case basis.

■ Appellant next asserts that he is excused because he acted upon the advice of a Metropolitan attorney. The "advice" received was not "legal advice", but "political advice" based upon the experience of a former director with a former mayor. There is no evidence that appellant asked for or received legal advice as to his legal duties and responsibilities.

■ Appellant next asserts that he is excusable because the Mayor condoned his neglect of duty. There is insufficient evidence in this record to establish condonation as a matter of law. *Pringle v. Producers Turpentine Co.*, 126 La. 1095, 53 So. 359 (1910) cited by appellant related to a private employer. There is serious doubt that a mayor has the authority to condone misconduct to the detriment of the rights of the people.

■ Appellant next insists that the city was estopped from acting against appellant because of the actions of the Mayor.

In *Putnam County v. Smith County*, 129 Tenn. 394, 164 S.W. 1147 (1913), cited by appellant, the estoppel related to estoppel by laches by 20 years acquiescence in legislation changing the boundary of the county.

*Goldston v. City of Harriman*, Tenn.1978, 565 S.W.2d 858 (1978), cited by appellant, involved a specific agreement between a city and a county beer board regarding beer permits existing within an area being annexed to the city.

Other authorities cited by appellant involve private rights rather than governmental operation.

The facts of this case do not justify the application of the doctrine of estoppel.

■ Appellant next insists that he should be exonerated because the Mayor approved his actions. Even though the Mayor acquiesced or participated in the effort to induce the Metropolitan Council to legislate square foot rates for fixing permit fees, this did not constitute approval of appellant's dereliction in failing to collect adequate fees at prior and subsequent times.

■ Appellant next insists that there was a waiver of his shortcomings by failure to comply with Civil Service Regulations as follows:

*Section 11.5 Evaluation for Merit Pay Increment and Salary Increase*

The annual evaluating shall be used in such a way to determine whether the employee has qualified himself for a pay increment, as provided by the pay plan. Such review should follow the procedures of the employee counseling interview so the employee can be informed of the quality of his work. Submission of a personnel status form recommending a merit pay increment or deferring the increment shall be evidence of such a review. A merit pay increment will be deferred until the employee's performance is standard as established by his Department Head for satisfactory service.

*Section 11.8 Written Warning to Employee*

Any time the performance of an employee has reached the level which could be considered unsatisfactory or which could cause his dismissal, the supervisor will issue a written warning to the employee concerned. This warning must be given the employee at least 60 calendar days before the 'as of' date of the employee's evaluation. It will set forth exactly how the employee is failing to measure up to the requirement of his position. The notice will state what this employee needs to do or how he needs to improve to have his performance reach a satisfactory level, and the suggestions recommended by the supervisor that will help the employee improve his performance.

However, the quoted regulations are in Chapter 11 of the Regulations which also contains the following:

*Section 11.3 Use of Evaluation*

Evaluation may be adapted to a variety of uses concerning the employees career. Some of the most typical uses are:

    a. Employee counseling interview

    b. Evaluation for merit increases

    c. Evaluation for promotion

    d. Factor in order of lay-offs

    e. Re-employment lists

    f. In-service training

Moreover, Chapter 10, which relates to disciplinary actions, contains the following:

*Section 10.2 Employee Working Relationship*

It shall be the duty of each employee to maintain high standards of cooperation, efficiency, and economy in his work for the Metropolitan Government. Department Head and supervisors shall organize and direct the work of their units to achieve these objectives. When work habits, attitude, production, or personal conduct of an employee falls below a desirable standard, supervisors should point out the deficiency at the time it is observed. Warning in sufficient time for improvement should precede formal disci-

plinary action, *but nothing in this section shall prevent immediate formal action whenever the interest of Metropolitan Government requires it.* (Emphasis supplied)

It therefore appears that appellant has no effective complaint as to demotion without prior evaluation.

Appellant next complains that the Trial Judge found dereliction in regard to failure to timely file transcripts of certain hearings of the Board of Zoning appeal when the Civil Service Commission made no such finding. The action of the Commission was a blanket approval of the action of the Mayor, and contained no specific findings of fact.

At the bar of this Court counsel for the Metropolitan Government stated that no reliance was placed in this Court upon the failure to file transcripts but that full reliance was made upon failure to collect proper fees. Since this Court is satisfied that the demotion of appellant was justified on the ground of under-collection of fees, the matter of transcripts need not be considered.

The judgment of the Trial Judge is affirmed. Costs of this appeal are taxed against the appellant. The cause is remanded to the Trial Court for collection of costs and such other proceedings, if any, as may be necessary and proper.

Affirmed and remanded.

LEWIS, J., concurs.

CONNER, J., dissents in separate opinion.

CONNER, Judge, dissenting.

I must respectfully dissent from the views of my distinguished colleagues in this matter.

At the outset, I believe it is unfortunate that the charter of Metropolitan Nashville and Davidson County does not allow the mayor to hire and fire all of his department heads at will.[1] This limitation places a difficult burden upon him in the performance of his executive duties. However, the framers of that charter in their wisdom saw fit to protect department heads coming under civil service from mayoral preference alone. This being the case, I believe that the proof in this record is insufficient to sustain a finding by the Civil Service Commission that Mr. England failed "to administer the department" by "keeping up with the times" and "increasing the building permit costs, which denied the Metropolitan Government funds." As I see it, from the time the appellant was appointed the Director of Codes Administration in 1974 until his demotion, he acted with reasonable prudence on the question of raising fees for building permits.

The proof disclosed that at most some eighteen months transpired after the appointment of the appellant before he began discussing with contractors the reasonableness of the existing policy of issuing building permits on the basis of a construction cost of ten dollars per square foot and before he began espousing the view that such charges were unrealistically low. If the appellant is to be demoted, in my view, it must be by his failure to promulgate new regulations during this eighteen month period in 1975 and 1976. This is because in early 1977 he sought the advice of an assistant metropolitan attorney as to what he should do about the matter of raising the fees. He was advised by that attorney of the previous "veto" by the mayor of a regulation proposed by the then department head, Robert Walker, appellant's predecessor, which attempted to increase the fees during the former Mayor Beverly Briley's

---

1. Charter of the Metropolitan Government of Nashville and Davidson County, Tennessee, Art. 5, § 5.03.

    Except as otherwise provided in this Charter, the mayor shall appoint all directors of departments, subject to limitations of civil service provided by this Charter, if any. All departmental directors not under civil service limita-

tions appointed by the mayor shall be confirmed by the council and may be removed by the mayor as provided herein or in the creating ordinance.

    The director of codes administration is a civil service employee and is not covered by the above quoted section.

administration. It was suggested to him by this attorney that he should ask Mayor Fulton's office for advice on how to proceed. In my view, it does not matter whether this advice could be classified as "political" or "legal." It was advice upon which he was entitled to rely and which, I believe, shielded appellant as to the actions he subsequently took.

Following the advice of counsel the appellant wrote the mayor in the spring of 1977 expressing his belief that there was a need for a fee increase and requesting the mayor's guidance in the matter. Obviously, the decision was made in the mayor's office that the matter was too "politically" sensitive for final determination in that forum. Thus, Mr. England was told to take the matter up with the Metropolitan Council of Nashville and Davidson County.

Significantly, after being apprised by the appellant on May 6, 1977, that in his opinion the rates were too low, the mayor did *not* instruct Mr. England to immediately raise the rates by regulation. Rather, his office suggested that the "political football" be passed on to the council.

Ordinances—as opposed to regulations—were prepared raising the rates after it was determined that "it was not in the best interest of the mayor to make the decision." The question lingered before the council for six months until the council requested the mayor to form a "study committee." The first such committee was formed in December, 1977. On February 7, 1978, nine months after Mr. England had first sought to get a rate increase with the assistance of Mayor Fulton, the mayor appointed a second study committee "to investigate underestimation of construction costs in obtaining permits." As a result of the report of that committee, the mayor then notified Mr. England that he was being demoted one grade and laterally transferred, which produced the instant action testing that demotion and transfer.

Though it is unfortunate that the mayor as of right could not have made this move with the department head, I do not believe that appellant should suffer, especially in the critical human areas of loss of self esteem and reputation, by what I find to be the unwillingness of the executive or legislative branch of the metropolitan government to support Mr. England's initial request for an increase—or to use his inaction as an excuse for avoiding the mandate of the metropolitan charter. I believe Mr. England was no more derelict in the performance of his duties in this matter than was the mayor, or, for that matter, the council. The eighteen month time period between his becoming director and his starting to take active steps to increase the fees favorably compares with the time period taken to go through the various processes of "passing the political buck," so to speak, by the office of the mayor and council. Thus, I cannot find cause for the punishment of Mr. England, regardless of how modest, by any inaction early in his tenure as Director of Codes Administration.

I agree with my learned brethren that the appellant did receive due process throughout the administrative hearing procedures. Further, I agree that the appellant's claim that he could not be used as a witness in a civil proceeding is without merit. However, for the reasons before stated, I agree with the appellant's contention that the actions of the mayor in demoting *and* laterally transferring Mr. England are not justified by the evidence in this record. Whether the legal niceties be couched in terms of estoppel, or executive condonation of, or acquiescence in, his actions, I do not believe Mr. England was treated fairly in view of the mandate of the charter.

I would overturn the action of the trial court and require appellant's reinstatement with all the entitlements attendant thereto.